# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JAMES RICHARD TUBEROSA, | ) | |
| Plaintiff. | ) | |
|  | ) | Civil Action No. _____ |
| v. | ) | |
|  | ) | |
| FINANCIAL INDUSTRY | ) | |
| REGULATORY AUTHORITY, INC., | ) | |
| Defendant. | ) | |

## COMPLAINT
### (Action for Equitable Relief, Declaratory Judgment, and Permanent Injunction)

### INTRODUCTION

Plaintiff, James Richard Tuberosa ("Mr. Tuberosa"), by and through the undersigned counsel, hereby submits this Complaint seeking an equitable and declaratory judgment that information related to the customer disputes filed on; (1) February 6, 2022 as Occurrence No. 1059790; (2) October 24, 2008 as Occurrence No. 1429606; (3) March 20, 2009 as Occurrence No. 1452807; (4) October 23, 2009 as Occurrence No. 1485168; (5) January 14, 2015 as Occurrence No. 1744882; and (6) January 16, 2018 as Occurrence No 1968859 (collectively, the "Occurrences") should be expunged from his IARD[1], IAPD[2], CRD[3], and BrokerCheck[4] records (together, his "Registration Records"), and seeking a permanent injunction against Defendant, Financial Industry Regulatory Authority, Inc. ("FINRA") (also, "Defendant"), from publishing any further references to the Occurrences on Mr. Tuberosa's Registration Records.

---

[1] The IARD, or Investment Adviser Registration Depository is an electronic filing system for Investment Advisers sponsored by the U.S. Securities and Exchange Commission (the "SEC"), with FINRA serving as the developer and operator of the system.

[2] The IAPD, or Investment Adviser Public Disclosure, is a public website sponsored by the SEC, which provides information about investment adviser firms and representatives, as well as links to BrokerCheck information.

[3] The CRD, or the Central Registration Depository is a FINRA owned and operated filing system that maintains registration information for broker-dealers and their representatives.

[4] BrokerCheck is a FINRA owned and operated website that contains certain information from the CRD that is available to the public without request.

## JURISDICTION AND VENUE

1.      The Court has subject matter jurisdiction over the present action as Section 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") grants the federal district courts "exclusive jurisdiction" over "all suits in equity and actions at law brought to enforce any liability or duty created by the Exchange Act or the rules and regulations thereunder." 15 U.S.C § 78aa(a).

2.      The Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1), D.C. CODE ANN. §§ 13-422 and 13-423 because FINRA maintains its principal place of business in the District of Columbia, and because the allegations and claims for relief herein arise from Defendant's transaction of business in the District of Columbia.

3.      As a result of Defendant's purposeful, substantial, and ongoing business activities in the District of Columbia, Defendant has established minimum contacts with the District of Columbia such that it is reasonable for Defendant to reasonably anticipate being subject to action in the courts of the District of Columbia.

4.      Venue is proper in this Court pursuant to 28 U.S. § 1391(b) as Defendant is located in the District of Columbia and this action relates to Defendant's activities within the District of Columbia.

## PARTIES

5.      PLAINTIFF, Mr. Tuberosa (CRD # 1277676), is a resident of Apollo Beach, Florida and has been in the financial services industry since 1984. Mr. Tuberosa is not currently registered with FINRA.

6.      DEFENDANT, FINRA, is a private corporation that acts as a self-regulatory organization ("SRO"). Defendant is a quasi-governmental organization that regulates its member brokerage firms and exchange markets, as well as financial advisors. Part of Defendant's duties as

2

an SRO include maintaining the CRD, which is a central licensing and registration system used by the securities industry. FINRA also maintains and operates BrokerCheck, a publicly accessible online database that contains information generated from the CRD. FINRA is monitored and regulated by the United States Securities and Exchange Commission (the "SEC"). FINRA is organized and existing under the laws of the state of Delaware but maintains its principal place of business in the District of Columbia.

## SUMMARY OF THE CLAIMS

7.      Mr. Tuberosa brings this action for equitable relief in the form of expungement of the Occurrences from his Registration Records pursuant to this Court's inherent equitable power and/or pursuant to FINRA rules.

8.      Mr. Tuberosa also brings this action, pursuant to 28 U.S.C. §2201, to seek a declaratory judgement that the Occurrences should be expunged pursuant to FINRA Rule 8312 and/or this Court's inherent equitable power.

9.      Mr. Tuberosa also brings this action for equitable relief in the form of a permanent injunction against Defendant to permanently enjoin Defendant from publishing the Occurrences on Mr. Tuberosa's Registration Records.

## GENERAL ALLEGATIONS

12.      FINRA was formerly known as the National Association of Securities Dealers ("NASD"). In 2007, the NASD changed its name to FINRA.

13.      Pursuant to authority delegated by the SEC, FINRA promulgates and enforces rules that govern the activities of all registered broker-dealer firms and registered representatives of those firms in the United States.

14.    Both broker-dealers and their registered representatives must register with FINRA in order to engage in the recommendation and sale of securities. Without the ability to conduct securities transactions, many registered representatives and broker-dealers could not do business.

15.    FINRA is the exclusive regulatory authority for registered representatives and broker-dealers who conduct the type of securities transactions within FINRA's purview.

16.    Once registered, either with FINRA the SEC, or a state securities division, registered representatives, investment advisers, investment adviser firms, and broker-dealers are assigned a number used to identify them on the CRD, the central licensing and registrations system used by the U.S. securities industry and its regulators. This number is called the "CRD number."

17.    Under FINRA Rule 4530, FINRA requires registered broker-dealers and registered representatives to disclose certain consumer-initiated disputes, termination events, and other occurrences within thirty (30) days of notification.[5]

18.    FINRA will then publish the disclosure on the registered representative's CRD record as an "Occurrence."

19.    FINRA publishes these disclosures regardless of merit. Indeed, FINRA does not investigate the merits of these disclosures prior to publication.

20.    The SEC monitors the securities industry. As part of its duties, the SEC sponsors the IARD, which is an electronic filing system that collects and maintains the registration reporting and disclosure information for registered investment advisors ("RIAs") and their associated persons. The SEC has tasked FINRA with the maintenance and operation of both the CRD and IARD systems.

---

[5] For Rule 4530, see https://www.finra.org/rules-guidance/rulebooks/finra-rules/4530.

21.     The IARD and CRD systems are operated and maintained by FINRA. FINRA is the registered copyright owner of both systems.

22.     FINRA and the SEC claim that the IARD and CRD systems have three objectives: (1) to create a regulatory system for investment advisors to improve overall regulation of advisors, (2) to make information about investment advisors available to the public, and (3) to provide investment advisors an efficient automated filing system.

23.     In 1996, Congress required that the SEC establish a readily accessible electronic process to respond to public inquiries about investment advisors and their disciplinary information. Therefore, the SEC created the IAPD website.

24.     The IAPD website is a publicly-accessible version of the IARD that publishes reports for SEC-registered and state-registered RIAs and IARs.

25.     Listed on an IAR's IAPD report are certain "disclosures," such as information on their regulatory and disciplinary history, certain criminal convictions, customer dispute allegations, and other information.

26.     All disclosures are highlighted in a big, bold, red box on the front of the IAR's IAPD page. A click on the big red "disclosure" box will bring the viewer immediately to the part of the IAPD report that further describes the disclosure.

27.     Information published to the CRD is also published to the IARD if an individual is dually registered with FINRA and the SEC or a state securities division. If an individual is registered with the SEC or a state only, but then later registers with FINRA, information on the IARD will feed to the CRD, and vice versa.

28.     FINRA also maintains and operates BrokerCheck (an almost identical website to the IAPD), a publicly accessible online database that contains information generated from the CRD.

29.     Once FINRA-registered, a BrokerCheck profile is created for a registered representative, which contains all disclosure information in one place.

30.     The BrokerCheck website also contains an easily-accessible link to an IAR's IAPD report regardless of whether that IAR is or ever was registered with FINRA.

31.     Since BrokerCheck and the IAPD were created, FINRA[6] has made a series of changes to the quantity and permanence of information available to the public on these websites.

32.     Initially, the public could only request these reports via written inquiry only.

33.     Now, these websites publish this information publicly, 24 hours a day, 7 days a week, without request.

34.     Unless expunged, disclosures and related settlements and arbitration awards are published on an individual's Registration Records permanently.

35.     There is also no restriction on access to IAPD or BrokerCheck reports, which means that disclosures impact not just a financial advisors' professional reputation, but their personal reputation, as well.

36.     Neither the SEC, state securities authorities, nor FINRA investigate or approve the information published on the Registration Records, and they acknowledge that it may not be accurate.[7]

---

[6] FINRA was created in July of 2007 through the consolidation of the NASD and the member regulation, enforcement, and arbitration operations of the New York Stock Exchange ("NYSE"). For purposes of simplicity, throughout this Complaint, the NASD, NYSE and/or FINRA will simply be referred to as "FINRA".
[7] *See* https://adviserinfo.sec.gov/ and click "Learn More About IAPD."

37.    FINRA Rule 8312(g) states that FINRA shall not release certain information, which includes, "offensive or potentially defamatory language or information that raises significant identity theft, personal safety or privacy concerns that are not outweighed by investor protection concerns."[8]

38.    FINRA Notice to Members 99-54 ("Notice 99-54") states that "ordering expungement of information from the CRD system that is found to be defamatory, misleading, inaccurate, or erroneous, is equitable in nature." The Notice also states that arbitrators are not required to state explicitly in the award that all of the elements required to satisfy a claim in defamation under governing law have been met.[9]

39.    FINRA's Dispute Resolution Guide for Arbitrators (the "Arbitrator's Guide") states that when information is "defamatory in nature," it serves to portray "the broker in a negative light."

40.    In order to ensure the reliability of the information contained within these reports, the SEC and FINRA established a right pursuant to FINRA Rule 2080[10] or 8312 to seek expungement of disclosures published on the Registration Records systems.[11]

41.    FINRA Rule 2080(a) requires that Members or Associated Persons obtain a court order "directing … expungement or confirming an arbitration award containing expungement relief." Pursuant to FINRA rules, expungement is appropriate when:

> (a) the claim, allegation or information is factually impossible or clearly erroneous; (b)
>
> the registered person was not involved in the alleged investment-related sales practice

---

[8] For the full text of FINRA Rule 8312, *see* https://www.finra.org/rules-guidance/rulebooks/finra-rules/8312.
[9] For the full text of Notice to members 99-54, *see* https://www.finra.org/rules-guidance/notices/99-54.
[10] For the full text of FINRA Rule 2080, *see* https://www.finra.org/rules-guidance/rulebooks/finra-rules/2080.
[11] This right to seek expungement was approved by the SEC, as any codified FINRA rule is.

violation, forgery, theft, misappropriation, or conversion of funds; or (c) the claim, allegation or information is false.

FINRA Rule 2080(b)(1).

42.     FINRA does not require a court order to expunge information found to be "defamatory in nature" if expungement is recommended by an arbitrator on those specific grounds. Absent an arbitration award recommending expungement on the grounds that the information is "defamatory in nature" or "potentially defamatory," FINRA will require a court order to expunge the information. *See*, Notice 99-54.

43.     FINRA does not have exclusive jurisdiction to determine expungement of disclosures from the Registration Records systems.

44.     FINRA Rule 2080(a) states that "Members or associated persons seeking to expunge information from the CRD system…must obtain *an order from a court of competent jurisdiction directing such expungement* or confirming an arbitration award containing expungement relief." (emphasis added).

45.     FINRA has also stated recently that "[a] broker can seek expungement of customer dispute information by going through the FINRA arbitration process or directly to court." Release No. 34-88251; File No. SR-FINRA-2020-005, Federal Register, Vol. 85, No. 38 at p. 2 at II(1)(a), (Feb. 26, 2020).

46.     A financial services professional's CRD and IARD records are available in their entirety without subpoena to state securities regulators and other law enforcement agencies.

47.     The information is also available to securities firms, which are required to review a financial services professional's Registration Records when making hiring and supervisory decisions.

48.    FINRA will not expunge information from the Registration Records databases absent an arbitration award or court order.

49.    Broker-dealers and RIA firms do not have authority to expunge information from the Registration Records databases.

50.    This Court is not bound by FINRA rules but may consider them at its discretion.

## SPECIFIC ALLEGATIONS

51.    The foregoing allegations are incorporated as if fully set forth herein.

52.    Mr. Tuberosa has been a financial services professional for over 40 years. He acquired his Series 6 license with the NASD on June 27, 1984, with First Investors Corporation. He then acquired his Series 63 license on September 12, 1984, his Series 7 license on January 18, 1986, and his Series 4 license on January 5, 1987. Mr. Tuberosa currently has a CRD record and public BrokerCheck record, as well as corresponding IARD and public IAPD records.

53.    Mr. Tuberosa is not currently registered with FINRA or the SEC. Mr. Tuberosa was previously registered with other FINRA and SEC registered investment adviser and broker-dealer firms, including Ameriprise (f/k/a Ameriprise Advisors Services, Inc.) (CRD No. 5979) ("Ameriprise Advisor"), Wells Fargo Clearing Services, LLC (CRD No. 19616) ("Wells Fargo"), Palm State Equities, Inc. (CRD No. 24271) ("Palm State"), American Wallstreet Securities, Inc. (CRD No. 21256), Lehman Brothers Inc. (f/k/a Shearson Lehman Hutton Inc.) (CRD No. 7506), who acquired E.F. Hutton & Company Inc. (CRD No. 235), Raymond James & Associates, Inc. (CRD No 705), and Foresters Financial Services, Inc. (f/k/a First Investors Corporation) (CRD No. 305).

## Occurrence Number 1059790

54.    In or around 2000, Mr. R. L. P.[12] ("Mr. P.") and Mrs. S. L. P. ("Mrs. P." (together, the "Ps") became clients of Mr. Tuberosa with Wells Fargo.

55.    Mr. Tuberosa met with the Ps in person, in order to determine their investor profile. The Ps had previously been employed by IBM and they owned IBM stock (the "IBM Stock"), which was the primary equity holding in their portfolio. They had a diversified portfolio, including mutual funds, stocks, and cash.

56.    The Ps completed and signed a Wells Fargo New Account form.

57.    Mr. Tuberosa presented the Ps with Wells Fargo's list of recommended bond investments, and the Ps selected a Kmart corporate bond (the "Kmart Bond") from the list. The list was comprised of bonds from Wells Fargo's mutual bond portfolio.

58.    Mr. Tuberosa explained to the Ps in detail the terms, risks costs, fees, advantages, and disadvantages of the Kmart Bond.

59.    The Ps liked the fact that Standard and Poor's rated the Kmart Bond as a better investment than the IBM Stock. They held their IBM stock and purchased the Kmart Bond with cash on hand.

60.    In or around 2001, the Ps purchased the Kmart Bond for $15,000, which represented less than 5% of their portfolio.

61.    Between approximately 2001 and 2004, Mr. Tuberosa met with the Ps regularly regarding the performance of the Ps' portfolio.

62.    In 2001 and 2002, due to market volatility following the effects of the 9/11 terrorist attacks, the value of the Kmart Bond declined.

63.    The Ps did not speak with Mr. Tuberosa about lodging a formal complaint.

---

[12] For privacy reasons, the client names have been omitted throughout. FINRA is aware of the clients' identities.

64.    On February 6, 2002, a customer dispute by the Ps was reported to Mr. Tuberosa's Registration Records, alleging that Mr. Tuberosa had "invested $15,000 in K-mart notwithstanding their claim that such an investment was speculative and inconsistent with their state[d] conservative investment objectives."

65.    On February 28, 2002, after completing a thorough investigation, Wells Fargo found that the Kmart Bond represented less than 5% of the Ps' portfolio, that it was suitable and consistent with the Ps' aggressive investment objectives, and that the Ps had authorized the purchase of the investment. Wells Fargo denied the claim.

66.    The Ps did not pursue their claim in arbitration or court.

### Occurrence Number 1429606

67.    In 1995, Mr. L. L. B. ("Mr. B.") and Mr.s L. K. B. ("Mrs. B.") (together, the "Bs") became clients of Mr. Tuberosa with Palm State through a referral.

68.    Mr. Tuberosa met in person with the Bs in order to establish their investor profile.

69.    Based on the Bs' investor profile and investment objectives, Mr. Tuberosa recommended a variety of diverse investments as part of a balanced, diversified portfolio.

70.    Mr. Tuberosa explained to the Bs in detail the terms, risks, costs, fees, advantages, and disadvantages of all his investment recommendations.

71.    On December 13,1999, Mr. Tuberosa left Palm State.

72.    On December 15, 1999, Mr. Tuberosa joined Wells Fargo.

73.    In or around 2004, Mr. Tuberosa made various investment recommendations based on the Bs' investor profile and investment objectives, including a certain variable annuity (the "B Annuity").

74.     Mr. Tuberosa explained to the Bs in detail the terms, risks, costs, fees, features, and benefits of the B Annuity. The Bs received and reviewed the prospectus associated with the B Annuity, which further explained its terms, risks, costs, fees, features, and benefits.

75.     In 2004, the Bs purchased the B Annuity. The completed and signed disclosure documents, wherein they affirmed their understanding of the terms, risks, costs, fees, features, and benefits of the B Annuity. They received copies of the signed documents.

76.     Between 2003 and October of 2008, Mr. Tuberosa met with the Bs regularly regarding the performance of their portfolio.

77.     On November 19, 2004, Mr. Tuberosa left Wells Fargo and registered with Ameriprise.

78.     In or around October of 2008, the Bs liquidated the B Annuity, incurring a surrender charge.

79.     The Bs did not speak with Mr. Tuberosa about lodging a formal complaint, as the Bs ultimately did not submit a complaint at all. However, the Bs did ask Mr. Tuberosa about the surrender charges.

80.     Ameriprise reported Mr. Tuberosa's interaction with the Bs to Mr. Tuberosa's Registration Records as a customer dispute despite Mr. B adamantly stating in writing that he was not complaining.

81.     On October 24, 2008, a customer dispute by the Bs was reported to Mr. Tuberosa's Registration Records.

82.     As of October 30, 2008, this dispute has been listed on Mr. Tuberosa's Registration Records as "Withdrawn."

83.     The Bs did not pursue their claim in arbitration or court.

**Occurrence Number 1452807**

84.    In 2005, Mr. L. C. ("Mr. C.") and his son, Mr. T. C. ("Mr. TC") (together, the "Trustees") became clients of Mr. Tuberosa at Ameriprise through a referral. The Trustees were co-trustees of a revocable trust (the "C Trust"). Mr. C had recently moved into the area and wanted a local financial advisor for the C Trust.

85.    The Trustees completed and signed Ameriprise's new account forms, affirming their investor profiles.

86.    On multiple occasions, Mr. Tuberosa met with the Trustees in order to determine their investor profiles. The Trustees each owned numerous private placement investments. Mr. Tuberosa informed them of the risks, including liquidity and portfolio concentration. The private placements later defaulted.

87.    Mr. Tuberosa made various investment recommendations based on the Trustees' investor profiles and investment objectives. The recommendations included reverse convertible bonds in blue chip stocks, including The Home Depot, Inc., AT&T, Inc., and IBM (collectively, the "Convertible Bonds").

88.    Mr. Tuberosa met in person and explained to the Trustees in detail the terms, risks, costs, fees, advantages, and disadvantages of the Convertible Bonds.

89.    In or around 2005, the Trustees purchased the Convertible Bonds. The Trustees affirmed in writing their understanding of the Convertible Bonds. Specifically, the Trustees acknowledged in writing the fact that, should the value of the Convertible Bonds decline below a predetermined price, the Convertible Bonds would be converted into blue-chip stocks. In connection with the Convertible Bonds, the Trustees completed and signed a risk acknowledgement form as well.

90.    Between 2005 and 2008, the Trustees purchased the Convertible Bonds.

91.    Between 2005 and approximately March of 2009, Mr. Tuberosa met with the Trustees regularly regarding the performance of their portfolio, which contained a variety of balanced, diversified investments, including: stocks, bonds, mutual funds, private placement investments, and cash. The Convertible Bonds represented less than ten percent of the Trustees' portfolio.

92.    Due to the widespread effects of the Great Recession, the value of the Trustees' portfolio declined. Additionally, Mr. TC's Dunkin' Donut business faced financial challenges, and he needed more income from the Trustees' portfolio.

93.    In or around early 2009, when the value of the Convertible Bonds declined below a predetermined price, the Convertible Bonds were converted into blue-chip stocks, in accordance with the terms of the bonds.

94.    The Trustees did not speak with Mr. Tuberosa about lodging a formal complaint.

95.    On March 20, 2009, a customer dispute by the Trustees was reported to Mr. Tuberosa's Registration Records, alleging negligence and unsuitability.

96.    On October 5, 2009, Mr. Tuberosa was working at Ameriprise Advisors when they changed their name to Ameriprise.

97.    On October 9, 2009, after completing a thorough investigation, Ameriprise denied the claim.

98.    The Trustees did not pursue their claim in arbitration or court.

**Occurrence Number 1485168**

99.    In 2005, Mrs. C. C. ("Mrs. C"), who was the wife of Mr. C and the step-mother of Mr. TC, both mentioned above, became a client of Mr. Tuberosa with Ameriprise through a referral.

100.    Mrs. C began investing with Mr. Tuberosa at the time when Mr. C transferred his account to Ameriprise.

101.    On multiple occasions, Mr. Tuberosa met with Mrs. C in order to determine her investor profile. Mrs. C had previously purchased high-risk private placement investments. Mrs. C wanted to invest in the same portfolio as Mr. C. Mr. Tuberosa explained the risk in these private placement investments, including, but not limited to, their illiquidity and little to no regulation. These private placements eventually defaulted.

102.    Based on Mrs. C's investor profile and investment objectives, Mr. Tuberosa recommended a variety of diverse investments as part of a balanced, diversified portfolio. The recommendations included mutual funds, blue chip stocks, and the Convertible Bonds (collectively, the "C Investments").

103.    Mr. Tuberosa explained to Mrs. C in detail the terms, risks, costs, fees, advantages, and disadvantages of the C Investments.

104.    Mrs. C received the prospectus associated with the Convertible Bonds. She affirmed in writing her understanding of the Convertible Bonds, including the fact that, should the value of the Convertible Bonds decline below a predetermined price, the Convertible Bonds would be converted into blue-chip stocks. In connection with the Convertible Bonds, Mrs. C completed and signed a risk acknowledgement form as well.

105.    Between 2005 and 2009, Mr. Tuberosa met with Mrs. C regularly regarding the performance of her portfolio (the "C Portfolio"), which contained her private placement

investments, the C Investments, stocks, and cash. The Convertible Bonds represented less than ten percent of the C Portfolio.

106.    Due to the widespread effects of the Great Recession, the value of the C Portfolio declined.

107.    In or around early 2009, as described above, when the value of the Convertible Bonds declined below a predetermined price, the Convertible Bonds were converted into blue-chip stocks, in accordance with the terms of the bonds.

108.    Mrs. C did not speak with Mr. Tuberosa about lodging a formal complaint.

109.    On October 23, 2009, a customer dispute by Mrs. C was reported to Mr. Tuberosa's Registration Records, alleging misrepresentation and unsuitability.

110.    On December 23, 2009, after completing a thorough investigation, Ameriprise denied the claim.

111.    Mrs. C did not pursue her claim in arbitration or court.

### Occurrence Number 1744882

112.    In 1995, Mr. E. C. A. ("Mr. A") became a client of Mr. Tuberosa with Palm State through a referral.

113.    Based on Mr. A's investor profile and investment objectives, Mr. Tuberosa recommended a variety of diverse investments as part of a balanced, diversified portfolio.

114.    Between 1996 and January of 2015, Mr. Tuberosa met with Mr. A regularly regarding the performance of Mr. A's portfolio.

115.    As stated above, Mr. Tuberosa left Palm State and joined Wells Fargo in December of 1999.

116.    On November 19, 2004, Mr. Tuberosa left Wells Fargo and registered with Ameriprise.

117.    Mr. Tuberosa found that Ameriprise strongly encouraged its representatives to solicit its own proprietary annuities to customers, including the RiverSource RAVA 5 Advantage variable annuity (the "RiverSource Annuity"). The RiverSource Annuity was issued by Ameriprise's subsidiary, RiverSource Life Insurance Company ("RiverSource").

118.    In or around May of 2011, Mr. A expressed his desire for an investment that would benefit his family trust (the "A Trust") and provide an annual return of at least five percent upon his death.

119.    In or around May of 2011, Mr. Tuberosa made various investment recommendations based on Mr. A's investor profile and investment objectives, one of which was the RiverSource Annuity.

120.    Mr. Tuberosa explained to Mr. A in detail the terms, risks, costs, fees, features, and benefits of the RiverSource Annuity, including the enhanced death benefit rider (the "Rider").

121.    Mr. A received and reviewed the prospectus associated with the RiverSource Annuity, which further explained its terms, risks, costs, fees, features, and benefits.

122.    In or around May of 2011, Mr. A purchased the RiverSource Annuity with the Rider. He completed and signed disclosure documents, wherein he affirmed his understanding of the terms, risks, costs, fees, features, and benefits of the RiverSource Annuity. He received copies of the signed documents. Mr. A named the A Trust as the beneficiary of the RiverSource Annuity.

123.    In or around January of 2015, Mr. A called RiverSource directly and stated that he was not concerned about his finances past his own death and that he wanted to know whether he

could remove the Rider from the RiverSource Annuity. Mr. A did not request the surrender of the RiverSource Annuity.

124. Mr. A told Tuberosa about his phone call with RiverSource, stating that the representatives of RiverSource had been rude and refused to listen to him.

125. On January 14, 2015, a customer dispute by Mr. A was reported to Mr. Tuberosa's Registration Records.

126. Mr. A wrote a letter to Ameriprise, wherein he stated that he had not intended to lodge any complaint against Mr. Tuberosa and that he had only intended to ask a question about removing the Rider from the RiverSource Annuity.

127. On February 11, 2015, after completing a thorough investigation, Ameriprise denied the claim. Mr. A adamantly stated in writing he was not complaining.

128. As he had had no intention of bringing a complaint in the first place, Mr. A did not pursue his claim in arbitration or court.

## Occurrence Number 1968859

129. In or around 2008, Mr. W. C. ("Mr. WC") and Mrs. A. C. ("Mrs. WC") (together, the "WCs") became clients of Mr. Tuberosa and his partner, Mr. John M. Price ("Mr. Price") (together, the "Advisory Team") with Ameriprise through a referral from Mr. WC's sister.

130. On numerous occasions, the Advisory Team met with the WCs to discuss their investor profiles and investment objectives. Mr. WC visited the Advisory Team's offices frequently, as both his sister and mother lived nearby.

131. Based on the WCs' investor profiles and investment objectives, the Advisory Team recommended a variety of diverse investments as part of a balanced, diversified portfolio, including stocks, bonds, and mutual funds.

132.    The Advisory Team explained to the WCs in detail the terms, risks, costs, fees, advantages, and disadvantages of all of its investment recommendations.

133.    Between approximately 2008 and January of 2018, the Advisory Team spoke with the WCs regularly regarding the performance of their portfolio (the "WC Portfolio"), which contained stocks, bonds, mutual funds, options, and cash. The WCs authorized all trading in the WC Portfolio.

134.    In or around April of 2015, the WCs completed and signed a margin trading agreement and an options trading disclosure form in order to engage in margin and options trading in the WC Portfolio.

135.    In or around April of 2015, the WCs began engaging in options trading. The WCs' options represented less than ten percent of the WC Portfolio and one percent of their net worth. All optioned trading in the WC Portfolio was authorized by the WCs.

136.    As of mid-2015, the WC Portfolio was performing well and increasing in value.

137.    However, as a result of market volatility, the WC Portfolio declined in value by approximately ten percent in or around 2016.

138.    The WCs did not speak with Mr. Tuberosa about lodging a formal complaint.

139.    On January 16, 2018, the WCs filed a written complaint.

140.    On February 26, 2018, after completing a thorough investigation, Ameriprise denied the claim.

141.    On April 5, 2018, Ameriprise received notice that the WCs had filed for FINRA arbitration (Case No. 18-01197).

142.    A corresponding customer dispute by the WCs was reported to Mr. Tuberosa's Registration Records.

143.    The WCs sought compensatory damages in the amount of $700,000.

144.    On March 22, 2019, as a business decision, Ameriprise settled with the WCs in the amount of $200,000. The settlement was a fraction of the amount sought and a nominal amount in the light of the potential cost of continued arbitration or litigation. Mr. Tuberosa did not contribute to the settlement amount, and he did not receive, review, or sign the settlement agreement. As part of the settlement, Mr. Tuberosa was dismissed from the case.

## FIRST CLAIM FOR RELIEF

### Equitable Relief for Expungement

145.    The foregoing allegations are incorporated as if fully set forth herein.

146.    Both federal and state courts possess broad equitable powers to order expungement of disclosures from a financial advisor's Registration Records, particularly where the disclosure causes ongoing reputational harm and lacks regulatory value. *See, Reinking v. FINRA,* No. A-11-CA-813-SS, 2011 WL 13113323, at *2 (W.D. Tex. Dec. 1, 2011); *Lickiss v. FINRA,* 208 Cal.App.4th 1125 (2012).

147.    Section 27(a) of the Exchange Act explicitly grants federal district courts "exclusive jurisdiction" over "all suits in *equity* and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder." 15 U.S.C. § 78aa(a) (*emphasis added*).

148.    FINRA's own rules recognize the propriety of expungement in circumstances such as this action, as evidenced by: (a) FINRA Rule 2080's provision for expungement of false or erroneous information; and (b) FINRA Rule 8312(g)'s prohibition on publishing misleading information.

149.    Beyond FINRA Rules, the SEC has also recognized the importance of removing inaccurate information from the Registration Records databases. *See,* SEC Release No. 34-48933, 68 Fed. Reg. at 74673.

150.    A request for expungement is a request for an equitable remedy. Although this Court is not bound by FINRA rules, it may consider them in its discretion as guidance for determining whether expungement should be granted.

151.    The exercise of this Court's equitable powers is particularly appropriate here because: (a) Mr. Tuberosa has no adequate remedy at law; (b) the challenged Occurrences cause continual, irreparable harm to his professional reputation; (c) FINRA's publication of the Occurrences serve no legitimate regulatory purpose; and (d) expungement would promote, rather than harm, the public interest.

152.    A statement is defamatory in nature if it paints the advisor in a negative light. A statement does not need to meet the elements of common law defamation to be defamatory in nature.

153.    To be clear, Mr. Tuberosa is not bringing or alleging any claim in tort in this action.

154.    The Occurrences are false and misleading. Mr. Tuberosa fully explained the investments, including all costs, fees, charges, benefits, and surrender policies, as applicable, to the customers. Further, the customers indicated that they reviewed all illustrations provided regarding the investments and signed all requisite account documents acknowledging their consent, approval, and understanding of the investment transactions. Mr. Tuberosa was never found to have engaged in any wrongdoing related to the customers. Additionally, all but one of the Occurrences were denied by the reporting firms. The remaining settled Occurrence was settled as a business decision for a mere fraction of the requested amount, and even still, the initial complaint

was first denied by its reporting firm before the customer brought the complaint to FINRA arbitration.

155.    The Occurrences are defamatory in nature because they paint Mr. Tuberosa in a negative light. They imply that he is not fit for his career, and he has been subjected to extreme scrutiny in his field because of the Occurrences. Importantly, the Occurrences are public, permanent (unless expunged), and the harm it causes is perpetual.

156.    The Occurrences mislead the public, employers, and regulators by improperly implying professional misconduct on the part of Mr. Tuberosa in contradiction to the evidence.

157.    FINRA's continued publication of the Occurrences does not benefit the public, nor does it provide meaningful information for employers or regulators. If there was even a minimal benefit to the public or regulators, it is substantially outweighed by the harm to Mr. Tuberosa's personal and professional reputation.

158.    Moreover, Mr. Tuberosa is suffering real, ongoing, and continuous harm with the Occurrences' continued publication as it causes compounding injury over time and each potential client or employer who views the disclosure represents a new instance of harm that cannot be quantified or compensated through monetary damages.

159.    The continued publication of the Occurrences do not offer any benefit or regulatory value to the investing public, nor does FINRA have an interest in publishing false and misleading information to its databases.

160.    Even if there is a minimal benefit to the public or regulators in the continued publication of the Occurrences, such benefit is substantially outweighed by the past, current, and potential for future harm to Mr. Tuberosa.

161.    The balance of equities strongly favors expungement because: (a) FINRA faces minimal burden in removing the disclosure, as it requires only administrative action; (b) Mr. Tuberosa faces ongoing, irreparable harm to his professional reputation; (c) the public interest is served by maintaining accurate registration records; and (d) no legitimate regulatory purpose is served by maintaining false or misleading information.

162.    Equity demands the expungement of the Occurrences, as their complete removal from Mr. Tuberosa's Registration Records is the only remedy that can prevent continuing harm to his reputation and business interests.

163.    This Court's equitable powers provide the appropriate mechanism to ensure the accuracy and fairness of public registration records while protecting legitimate business interests.

## SECOND CLAIM FOR RELIEF

### Declaratory Judgment for Expungement

### (28 U.S.C. §2201)

164.    The foregoing allegations are incorporated as if fully set forth herein.

165.    Pursuant to 28 U.S.C. §2201, this Court may "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought...[and] such declaration shall have the force and effect of a final judgment or decree[.]"

166.    Declaratory relief requires a determination of (1) an actual, substantial controversy, (2) involving an interested party, (3) that warrants the immediate issuance of a declaratory judgment. *Glenn v. Thomas Fortune Fay*, 222 F.Supp.3D 31, 35 (D.C.Cir. 2016).

167.    While there are "no dispositive factors" the D.C. Circuit has listed several relevant considerations when determining whether or not to exercise the Court's jurisdiction over declaratory actions: (1) whether the declaratory judgment would finally settle the controversy

between the parties, (2) whether other remedies are available or other proceedings pending, (3) the convenience of the parties, (4) the equity of the conduct of the declaratory judgement plaintiff, (5) prevention of procedural fencing, (6) the state of the record, (7) degree of adverseness between the parties, and (8) the public importance of the question to be decided. *Swish Marketing, Inc. v. F.T.C.*, 669 F.Supp.2d 72, 76-77 (D.C.Cir. 2009); *Printing Packaging & Prod. Workers Union of N. Am. v. Int'l Bhd. of Teamsters*, 2024 WL 3835353, at \*9 (D.C.Cir. 2024) ("In this Circuit, 'two criteria are ordinarily relied upon: 1) whether the judgment will serve a useful purpose in clarifying the legal relations at issue, or 2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" (*quoting Glenn*, 222 F. Supp. 3d at 36.)).

168.    As outlined above, Mr. Tuberosa is entitled to expungement of the Occurrences from his Registration Records under equitable theories of relief, under FINRA rules, or both.

169.    The parties to this case, Mr. Tuberosa and FINRA, are two interested parties to the expungement: Mr. Tuberosa as the individual whose Registration Records would be affected by an expungement and FINRA as the owner and operator of the CRD and BrokerCheck systems from which the Occurrences are sought to be expunged.

170.    The publication of the Occurrences on Mr. Tuberosa's Registration Records is causing, and will continue to cause, substantial, irreparable harm to Mr. Tuberosa by infringing on his privacy rights, inhibiting his ability to seek and engage in advantageous business relationships, and injuring his personal and professional reputation. Every moment that the Occurrences are not expunged, more members of the public, and potential and current clients and employers are able to view the Occurrences, warranting the immediate issuance of a declaratory judgment.

171.    The only remedy to the harm these Occurrences causes to Mr. Tuberosa is expungement.

172.    Expungement would settle the controversy between the parties.

173.    There is no other pending proceeding regarding the matters at issue in this case.

174.    Removing the Occurrences from Mr. Tuberosa's Registration Records will not cause any harm to FINRA as the management of Registration Records systems is part of its fundamental responsibilities.[13] If expungement is granted, FINRA is able to remove the Occurrences from Mr. Tuberosa's Registration Records with just a few clicks of a keyboard from their office.

175.    Removing the Occurrences from Mr. Tuberosa's Registration Records will further the public interest because the public has a legitimate interest in access to accurate public records and the removal of the Occurrences will not adversely affect the public, as the publication of false and misleading information about registered representatives cannot accomplish the investor protection that the Registration Records systems purport to provide.

176.    Additionally, a declaration of expungement will "clarify the legal relations" between Mr. Tuberosa and FINRA and afford relief from the controversy giving rise to this proceeding as it will facilitate the removal of the Occurrence.

177.    Mr. Tuberosa therefore requests a declaratory judgment, in accordance with 28 U.S.C. §2201, that the Occurrences should be expunged from his Registration Records pursuant to this Court's inherent equitable power and/or pursuant to FINRA rules.

### THIRD CLAIM FOR RELIEF

### Permanent Injunction

---

[13] https://www.finra.org/about/what-we-do.

178.    The foregoing allegations are incorporated as if fully set forth herein.

179.    "A party seeking a permanent injunction must show: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Ramirez v. U.S. Immigr. & Customs Enforcement*, 568 F.Supp.3d 10, 21 (D.D.C. 2021) (*quoting Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010)); *Printing Packaging*, at *9.

180.    As detailed above, the publication of the Occurrences on Mr. Tuberosa's Registration Records is causing, and will continue to cause, substantial, irreparable harm to Mr. Tuberosa by infringing on his privacy rights, inhibiting his ability to seek and engage in advantageous business relationships, and injuring his personal and professional reputation.

181.    There are no other remedies at law available to Mr. Tuberosa, including monetary damages, that would correct this harm.

182.    Removing the Occurrences from Mr. Tuberosa's Registration Records will not cause any harm to FINRA as the management of Registration Records systems is part of its fundamental responsibilities and an equitable remedy is warranted.

183.    Removing the Occurrences from Mr. Tuberosa's Registration Records will not disserve the public. In fact, removing the Occurrences from Mr. Tuberosa's Registration Records will further the public interest because the public has a legitimate interest in access to accurate public records and removal of the Occurrences will not adversely affect the public, as the publication of false and misleading information about registered representatives cannot accomplish the investor protection that the Registration Records systems purport to provide.

184.     Mr. Tuberosa seeks to permanently enjoin FINRA from continuing to publish any and all references to the Occurrences on Mr. Tuberosa's Registration Records.

## RELIEF REQUESTED

**WHEREFORE**, Mr. Tuberosa prays to this Court for entry of judgment and relief as follows:

A. Entry of judgment in favor of Mr. Tuberosa declaring his right to expungement of the Occurrences from his Registration Records pursuant to the Court's equitable power and/or pursuant to FINRA rules;

B. Entry of judgment and/or an Order directing FINRA to expunge the Occurrences from Mr. Tuberosa's Registration Records and remove all other references to the Occurrences from Mr. Tuberosa's Registration Records;

C. An Order enjoining FINRA from continuing to publish any and all references to the Occurrences; and

D. Any and all further relief as this Court deems just and proper.


Dated: April 1, 2025                          KUTAK ROCK LLP

                                              /s/ *Craig B. Young* (D.C. Bar 279788)
                                              1133 Connecticut Avenue, NW, Suite 1200
                                              Washington, D.C. 20036
                                              (202) 828-2328
                                              craig.young@kutakrock.com


                                              **HLBS LAW**

                                              */s/William R. Bean* (pro hac vice pending)
                                              William R. Bean, Esq.
                                              HLBS Law
                                              390 Interlocken Crescent, Suite 350
                                              Broomfield, CO 80021
                                              (603) 696-4890
                                              William.bean@hlbslaw.com